UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA

Case Number: 1:05-cr-10106-DPW

v.

MICHAEL O'DONNELL,
Defendant.

### DEFENDANT'S SENTENCING MEMORANDUM

Preliminary

The defense requests the following grounds for departure and sentencing mitigation (variance):

*Departure.* A combination (USSG §5K2.0) of Mr. O'Donnell's diminished mental capacity (USSG §5K2.13), his extraordinary mental and emotional conditions, marked by treatable mental illness and a childhood of physical and sexual abuse and foster care (USSG § 5H1.3), are all present to an extraordinary degree such that this case falls outside the "heartland" of like offenses.

*Departure.* The Court may grant Mr. O'Donnell a departure based on USSG s§ 5G1.3 & 5K2.0 and the US Bureau of Prison's likely failure to credit good time under 18 USC §3585. Mr. O'Donnell was detained on state charges but also under a USMS detainer in Middlesex County. The US Attorney did not institute an action in this case (for the 2003 offense) and Mr. O'Donnell was acquitted in the state court action after incarceration of 28 months awaiting trial.

*Mitigation/Variance.* Mr. O'Donnell's sentence should be shortened to serve the purposes of the Sentencing Reform Act. This Court may vary Mr. O'Donnell's sentence downward to account for the combination of diminished capacity and extraordinary mental and emotional state to reduce Mr. O'Donnell's sentence. The Court may wish to account for time Mr. O'Donnell was incarcerated and the USAO made no attempt to

1

bring charges. Any such sentence should also provide for a six-month period of alternative corrections on supervised release at the Lawrence CAC (described below).

## FACTS

A. General

Now 38, Michael O'Donnell has lived in one form or another of official custody for the last 25 years since age 13. A victim of maternal sexual abuse (PSR ¶¶ 98 & 102), his alcoholic father obtained a CHINS petition against him at age 13 because the father was unable to manage(PSR ¶103).[1] Since then, Mr. O'Donnell has been at liberty, by his estimate, for only a few months. A review of Mr. O'Donnell's personal and criminal history as set forth in the PSR confirms that assessment. See, PSR ¶¶ 62 - 91.

Unfortunately for Mr. O'Donnell (and for criminal justice), great resources have been directed toward punishing Mr. O'Donnell but little has been done about treating him. Based on the assessment counsel's neuropsychological expert (which the Court has paid for), Mr. O'Donnell's disorders and his criminality are linked; his disorders can be treated and, consequently, his criminality may be corrected. (Neuropsychological Assessment of Dr. Charles Drebing, Ex. A; see, also, September 17, 1998 report of Dr. John Daignault, Ex. B for similar conclusions.)

B. Mental Health Impairment

According to Dr. Charles Drebing's multi-part neuropsychological evaluation administered on March 31, 2006, Mr. O'Donnell suffers from long-standing attention

---

[1] Counsel contacted the father on April 19, 2006 and the father promised to write a letter describing the son's upbringing. As of today's date, counsel has had no further contact with the father.

2

deficit hyperactivity disorder and panic disorder (with attendant mixed personality disorders and poly substance abuse).

> What is the possible role of these disorders in the Mr. O'Donnell's criminal behavior? Attention Deficit Disorder is often found in children who also have Oppositional Defiant Disorder as well as in those who develop substance use disorders. The nature of the relationship is not clear, though many professionals believe that the combination of difficulty succeeding in school and other activities due to inattention, contributes to undersocialization and subsequently larger behavioral problems and substance use. While this may be well be true for Mr. O'Donnell, his chaotic family life and the extensive physical and sexual abuse he suffered also seem likely to have contributed substantially to many of his behavioral problems.
>
> \* \* \* \* \*
>
> Among the psychological disorders that contribute to people being in jail, ADHD is one of the more treatable disorders. By Mr. O'Donnell's report, treatment with Ritalin addresses the exact symptoms we have talked about – difficulty focusing on consequences of behavior, tendency toward impulsiveness. Mr. O'Donnell states that he was a "new man" when he was on Ritalin, a report I have commonly heard from victims of ADD/ADHD who don't receive any treatment until adulthood. While not a panacea, psychostimulant treatment is often quite effective in changing the cognitive and behavioral symptoms of ADD/ADHD in children and adults. It is unfortunate that the correctional healthcare system did not sustain treatment with Ritalin in one of its forms. The use of Wellbutrin is common among adults with ADD/ADHD, though it is clearly less effective in this case. More unfortunate is that fact that Mr. O'Donnell has been withdrawn from all medications for significant periods of time, including at the time of this evaluation. An important treatment goal for this individual will be to maintain a steady treatment regimen, ideally with medications that are most effective for him.

Neuropsychological Report, "Summary and Recommendations", pp. 6 -7. Ex. A.

C.  Past and Future Conditions of Release

Mr. O'Donnell needs to live in a community corrections setting on supervised release, subject to restrictive conditions that include medication, the oversight of a psychologist, work-live conditions with confinement and twelve-step substance abuse treatment. When Mr. O'Donnell finished serving his last federal sentence of

incarceration in 2003, he was released to the street in Boston with no supervision. Mr. O'Donnell's release failed, an expected result given his disorder and his complete inexperience with living at liberty. His counsel, Syrie D. Fried, Esq., described the circumstances of his release into homelessness in downtown Boston and how the Bureau of Prisons had failed to provided the treatment programs recommended in the Hon. Robert E. Keeton, USDCJ's 1998 judgment and sentence. (See, Trasncript of Revocation Hearing in *US v. O'Donnell*, Action No. 98-cr-10014-REK, August 6, 2002, pp. 3-8.).

Counsel believes that Mr. O'Donnell can be housed on supervised release in the appropriate corrections setting at the Essex County facility known as the "Lawrence Farm". Probation confirms that there is a contract with Essex County for federal defendants to use the "Farm". The general period of release into the Farm is six months. (See, Ex. C, Essex County Sheriff, Lawrence Correctional Alternative Center.) Mr. O'Donnell's period of incarceration should account for a period of release to the farm as one of the grounds to mitigate the sentence and achieve the corrections purposes of 18 USC 3553(a).

D. Federal Charging Decisions Interfered with Credit for Time Served

A federal detainer for the first of the instant charges was lodged against Mr. O'Donnell while he was awaiting a Middlesex County Superior Court trial (Docket No. MICR 2003-0173). See, PSR ¶¶ 89-91. In that time, Mr. O'Donnell had uncounseled meetings with the US Attorney's Office and confessed to crime alleged in the first count of the information. The US Attorney's Office did nothing with Mr. O'Donnell's case

4

except to wait for the outcome of the state charges. Mr. O'Donnell was acquitted at trial on September 12, 2005 after more than two years' detention from May 15, 2003 (Ayer District Court, 03-48-CR-917, Malden Dist. Court 03-50-CR-1766.

## ARGUMENT

*Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.* U.S. v. Carvajal, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005).

## POINT I:
## THIS COURT HAS BROADER SENTENCING AUTHORITY

A.   Contours of the New Sentencing Law

The Court is familiar with the contours of the federal criminal sentencing law as it has evolved over the last seven years. *Jones v. United States*, 526 U.S. 227 (1999), to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to *Ring v. Arizona*, 536 U.S. 584 (2002), to *Blakely v. Washington*, 542 U.S. _, 124 S. Ct. 2531 (2004), *United States v. Booker*, 125 S. Ct. 738, 748-50 (2005). One Judge in this District made a succinct remark at a sentencing a week after *Booker*: "I think I have a little more flexibility now".[2] Described more in the terms of statutory interpretation, the remedial majority "modified" the SRA by "sever[ing] and excis[ing]" 18 U.S.C. § 3553(b)(1) – "the provision of the federal sentencing statute that makes the Guidelines mandatory," and 18 U.S.C. § 3742(e) – the appellate review section "which depends upon the Guidelines' mandatory nature," including in particular *de novo* review which made "Guidelines sentencing even more

---

[2] Hon. Richard G. Stearns, USDCJ, at January 28, 2005 sentencing of Robert Davis, 1:02-cr-10113-RGS.

5

mandatory than it had been."[3]   See 125 S. Ct. at 756-57, 764, 765.  "So modified, the Federal Sentencing Act . . . makes the Guidelines effectively advisory.  It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C. §3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)."  *Id.* at 757.  Sentencing courts must now consider all of the goals and factors set forth in 18 U.S.C. § 3553(a), not just the guidelines and policy statements in the Guidelines Manual.  See *Booker*, 125 S. Ct. at 757, 764, 766, 767, 768. See also, *e.g.*, *United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. Feb. 2, 2005).

The mandatory provisions of the SRA contained in §3553(b)(1) no longer apply; the new statutory directive is now one that limits the harshness of a defendant's sentence to one that is *no greater than necessary* to achieve the purposes of the SRA; the sentence must be "**sufficient, but not greater than necessary,**" to fulfill "(2) the need for the sentence imposed –"

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant;
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2) (emphasis supplied).

---

[3] Counsel borrows freely from an October 12, 2005 memorandum of Amy Baron-Evans, FDO Resource Counsel, entitled "Sentencing Post *Booker*".

This increased "flexibility" allows the Court to fashion a sentence for Mr. O'Donnell that is more appropriate to his personal and criminal history and his mental illnesses. While counsel believes that Mr. O'Donnell's mental illnesses and horrific social history would qualify under *Koon* for a pre-*Booker* departure (see, *infra*), such an inquiry is needlessly mechanistic. Post-*Booker* cases illustrate that a court may consider formerly discouraged factors, or facts that would not have met pre-*Booker* standards for departure, to impose a lower sentence. See, *e.g., United States v. Spigner*, 416 F.3d 708, 711-13 & n.1 (8th Cir. 2005) (health problems); *United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (that defendant was caretaker for brain damaged son may be considered under 3553(a) though there were alternative means of care and thus not ground for departure).

One inarguable factor in Mr. O'Donnell's sentence is his age. Now 38, he will be well over forty upon release, whatever sentence this Court imposes. As to defendants over forty, the risk of recidivism drops dramatically, lessening the need to protect the public from further crimes of the defendant under 3553(a)(2)(C). See, *United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available www.ussc.gov/publicat/Recidivism_General.pdf

Thus, generally, though age and infirmity were discouraged bases for departure, they may now be considered regularly under 3553(a). *United States v. Lata*, __ F.3d __, 2005 WL 1491483 at *5 (1st Cir. June 24, 2005); *United States v. Thomas*, 360 F.Supp.2d 238,

7

243 (D. Mass. Mar. 14, 2005); *Simon v. United States*, 361 F.Supp.2d 35 (E.D.N.Y. Mar. 17, 2005).

For example, the First Circuit has allowed resentencing where a court has been reluctant to impose Career Offender treatment as excessive and counterproductive. The defendant's age may warrant a lower sentence if, because of his age, the resulting sentence is greater than necessary to reflect the seriousness of the offense. See, *United States v. Lewis*, 406 F.3d 11, 21-22 (1st Cir. 2005) (remanding for re-sentencing where district court expressed concern that the guideline sentence of 319 months amounted to a life sentence for a defendant who was 38 years old; finding under the circumstances, "we are satisfied that the district judge might well have given a different sentence if the advisory guideline regime had been in force." ).

While counsel acknowledges that cases from the Southern District of New York do not have precedential value, the rationale contained in them and their relevance to this case may have weight and persuasive value with this Court. In drug cases, a Career Offender treatment may be too harsh where the defendant would be in his late forties when he emerged from prison. The rationale is that the goal of rehabilitation

> cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.

*U.S. v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005). Such reasoning is permissible in the post-*Booker* regime:

> Balancing the need for meaningful deterrence with section 3553(a)'s statutory demand to "impose a sentence sufficient, but not greater than

necessary, to comply with the purposes" of sentencing, see 18 U.S.C. § 3553(a), this Court believes a non-Guideline sentence is warranted. See *United States v. Carvajal*, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005) (stating, "But [the Career Offender guidelines] are excessive, in light of the nature of [defendant's] recidivism, for the Guidelines for Career Offenders are the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria. A sentence that satisfies only the Guidelines would be "greater than necessary, to comply with the purposes" set forth in the statute."); *United States v. Phelps*, 2005 WL 984156, at *6 (E.D. Tenn. April 1, 2005) (noting, "[i]t is not unusual that the technical definitions of "crime of violence" and "controlled substance offense" operate to subject some defendants to not just substantial, but extraordinary, increases in their advisory Guidelines ranges. In some of these cases, the Court believes a non-Guideline sentence may be sufficient, but not greater than necessary, to both comply with Congress's desire to punish recidivism and the purposes of sentencing set out in § 3553(a)(2).")

*US v. Hernandez*, 04-cr-424-20(RWS)(S.D.N.Y. June 10, 2005). *US v. Rosado*, 254 F.Supp.2d 316, 21 (SDNY 2003)("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner.")

POINT II:
COMBINATION DEPARTURE
DIMINISHED CAPACITY;
EXTRAORDINARY MENTAL AND
EMOTIONAL CONDITION;
ADVANCING AGE OF DEFENDANT
LESS LIKELY TO "RECIDIVATE"

A.   Combination Departure

Pursuant to U.S.S.G. § 5K2.0, it is permissible to base a downward departure on a combination of factors, none of which would suffice when considered individually, if those factors are present to an exceptional degree. *Koon v. U.S.*, 518 U.S. 81 (1996)(seminal case in which Justice Kennedy upheld departure for officer convicted of

9

violating civil rights in beating of Rodney King). *See* § 5K2.0 *Commentary* ("The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the heartland cases...even though none of the characteristics or circumstances individually distinguishes the case."); *see also United States v. Bogdan*, 284 F.3d 324, 328-330 (1st Cir. 2002); *see also United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990) (factors inadequate to warrant departure when taken in isolation may in combination suffice to remove a case from the heartland). This practice is common to other Circuits as well as this one. *See, e.g., United States v. Rioux*, 97 F.3d 648, 663 (2nd Cir. 1996), (Second Circuit affirming a downward departure based on a combination of the defendant's physical condition and charitable work even though such factors are not ordinarily relevant in determining whether the defendant should receive a downward departure); *accord, United States v. Broderson*, 67 F.3d 452, 458-59 (2d Cir. 1995) (departure where "confluence of circumstances was not taken into account by the guidelines); *United States v. Bowser*, 941 F.2d 1019, 1024-25 (10th Cir. 1991) ("unique combination of factors" warranted departure).

B. Diminished Capacity

The reports offered at defense Exhibits A & B establish that Mr. O'Donnell suffers from a treatable form diminished mental capacity and that his conduct is connected with that mental defect. USSG §5K2.13 authorizes a departure if (1) the defendant committed the offense while suffering from "a significantly reduced mental capacity" and this reduced capacity "contributed substantially to the commission of the crime."

The Court may not depart if the reduced capacity was "caused by the voluntary use of drugs," the offense involved "actual violence or a serious threat of violence". The limitations on this departure ground questionable in light of Booker; see Point I, *supra*.

This Circuit does recognize diminished mental capacity as a grounds for departure and mitigation of sentence.[4] It has allowed a District Court to apply the departure in bank robbery prosecutions, despite that granting such a departure is disfavored where the is a need to protect the general public. *United States v. Gorsuch*, 404 F.3d 543 (1st Cir. 2005)(schizophrenic female defendant); see, also, *United States v. Podolsky*, 158 F.3d 12 (1st Cir. 1998)(obsessive compulsive disorder), but see, *United States v. Maldonado-Montalvo*, 356 F.3d 65 (1st Cir. 2003) (based on pre-*Booker* standard, clinical depression not sufficiently extraordinary).

> On remand, the district court must consider the sentencing guidelines - but only on an advisory basis - and also must consider the other statutory factors set forth in 18 U.S.C. § 3553 (a), see Booker, 125 S.Ct. at 764-65, under which Gorsuch's serious mental illness, maternal responsibilities, and lack of a criminal record may be more relevant than under the pre-Booker regime of mandatory guidelines. On any further appeal, we will review the sentence imposed only for reasonableness. Id. at 765-66. *Gorsuch, supra*.

Though the First Circuit had noted that the departure was not often granted in circumstances of a bank robbery in the majority of Circuits, it views the district courts

---

[4] The principle that a diminished capacity reduces moral culpability is well recognized. See, *Tennard v. Dretke*, 124 S.Ct. 2562, 2571 (2004)("impaired intellectual functioning is inherently mitigating"); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) ("Mentally retarded persons... do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."); Penry v. Lynaugh, 492 U.S. 302, 322 (1989) (O'Connor, J., concurring) ("mental retardation may render a defendant "less morally culpable than defendant who have no such excuse").

11

as having more authority to depart post-*Booker* and would review such a departure only in the context of the overall reasonableness of the sentence.

> Although we tentatively favor the former interpretation, we need not definitively resolve the question at this time because, in the post-Booker world, the sentencing guidelines are only advisory and the district court may justify a sentence below the guideline level based upon a broader appraisal. We therefore believe that the course of prudence is to vacate the sentence on count two and permit the district court to reconsider the matter under the Booker format. *Gorsuch, supra.*

Reviewing the Levine 108 Easy Mitigating Factors departure digest reveals that departures and sentence mitigations based on diminished capacity are common. Counsel notes but a few examples: *US v. Zedner*, 401 F.3d 36 (2nd Cir. 2005)(mental illness motivated financial crimes); *US v. Cantu*, 12 F.3d 1506, 1512, 1516 (9th Cir. 1993)("goal of the guideline [§ 5K2.13] is lenity toward defendants whose ability to make reasoned decisions is impaired" --where felon possessed firearm suffering post-traumatic stress disorder); *US v. Thompson*, 315 F.3d 1071 (9th Cir .2002) (district court should consider departure for diminished capacity because defendant could not control his addiction to porn);  — *US  v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) (affirmed 4-level downward departure under §5K2.13 drug use was both "a product and factor of his impaired mental condition"); *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) (death penalty-vacated "more than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system"); *United States v. Crockett*, 330 F.3d 706  (6th Cir. 2003) (in income tax fraud case diminished capacity downward departure from 21 months to probation affirmed because of defendant' depressive disorder); *US  v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000) (district court's two-level downward departure under §5K2.13 in computer fraud, based on defendant's

compulsive gambling disorder, not an abuse of discretion); *Penry v. Lynaugh*, 492 U.S. 302, 322 (1989) (O'Connor, J., concurring) ("mental retardation may render a defendant "less morally culpable than defendant who have no such excuse"). *U.S. v. Davis*, 919 F.2d 1181, 1187 (6th Cir. 1990) (downward departure justifiable when defendant commits nonviolent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of intoxicants); *U.S. v. Ruklick,* 919 F.2d 95, 97, 99 (8th Cir. 1990) (downward departure justifiable when defendant suffered from longstanding schizophrenic affective disorder); *U.S. v. Weddle,* 30 F.3d 532, 540 (4th Cir. 1994) (downward departure for defendant suffering from Hodgkin's disease upheld in conviction for mailing threatening letters in violation of 18 U.S.C. §876);*U.S. v. Adonis,* 744 F.Supp. 336 (D.D.C. 1990) (downward departure where D's IQ of 64 showed he was retarded where average IQ of prison population is 93).

C.  Age and Recidivism

Mr. O'Donnell's age is an important consideration in this Court determination of sentence. Age, more than any other general factor, is the strongest indicator of recidivism and the need for a longer or shorter sentence to protect the public. While age and infirmity were discouraged bases for departure, they should be considered under 3553(a). *United States v. Lata,* __ F.3d __, 2005 WL 1491483 at *5 (1st Cir. June 24, 2005); *United States v. Thomas,* 360 F.Supp.2d 238, 243 (D. Mass. Mar. 14, 2005). Physical condition, which may be related to age, is addressed at § 5H1.4." Section 5H1.4 states, in part: "Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. " As to defendants over

forty, however, the risk of recidivism drops dramatically, lessening the need to protect the public from further crimes of the defendant under 3553(a)(2)(C). See *United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

Counsel believes that if Mr. O'Donnell were released at age 45, the chances of his recidivism would be far lower, especially were he given the type of pre-release confinement counsel has suggested at Lawrence CAC. See *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines*, at pp. 12 & 28 (2004)("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www w.ussc.gov/publicat/Recidivism-General.pdf.).

### POINT III:
### TIME SERVED CREDIT AND THE GOVERNMENT'S CHARGING DECISIONS

The government's decision not to charge Mr. O'Donnell after his arrest by the Commonwealth on the 2003 bank robbery charge has prevented him from receiving credit for time served under 18 USC §3585. Mr. O'Donnell asks for a departure to obtain credit for lost time that will likely not be accounted for in the Bureau of Prisons and which is not ordinarily subject to reduction for concurrent sentencing under USSG §5G1.3.

The Guidelines offer clear authority to impose concurrent sentences on related charges in state and federal courts to impose just punishment. However, where the state and federal authorities make a complicated set of charging and detention decisions, the analysis becomes more complicated for the defendant and the Court. Under the circumstances, it might appear to some that the government has bided its time in the hope of obtaining consecutive sentences on successive prosecutions in state and federal court. Mr. O'Donnell was arrested initially by Massachusetts and prosecuted in Ayer District Court for the 2003 bank robbery on May 15, 2003. The Commonwealth later dropped that prosecution in favor of a robbery prosecution on which it lost at trial on September 12, 2005. All that time, the USMS had lodged a detainer against Mr. O'Donnell.

The problem for Mr. O'Donnell in obtaining credit for time served now exists in that he was not convicted in state court. USSG §5G1.3 allows sentences to run concurrently with an undischarged term of imprisonment on an unrelated state sentence.

> After calculating the total offense level, section 5G1.3 of the Guidelines addresses cases in which the defendant, at sentencing, is already serving an undischarged term of imprisonment. To prevent duplicative punishment, subsection 5G1.3(b) requires that when the undischarged term "resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense," the new sentence must run concurrently with the undischarged term. U.S.S.G. § 5G1.3(b). Where the prior offenses have not been "fully taken into account" in determining the offense level for the instant offense, however, subsection 5G1.3(c) provides that the new sentence "may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term . . . to achieve a reasonable punishment for the instant offense." Id. § 5G1.3(c). *United States v. Austin*, 239 F.3d 1 (1st Cir. 2001).

Because of the government's charging decisions, Mr. O'Donnell's detention is partially related to the instant charges. According to the application notes:

> (E) <u>Downward Departure</u>.—Unlike subsection (b), subsection (c) does not authorize an adjustment of the sentence for the instant offense for a period of imprisonment already served on the undischarged term of imprisonment. However, in an extraordinary case involving an undischarged term of imprisonment under subsection (c), it may be appropriate for the court to downwardly depart. This may occur, for example, in a case in which the defendant has served a very substantial period of imprisonment on an undischarged term of imprisonment that resulted from conduct only partially within the relevant conduct for the instant offense. In such a case, a downward departure may be warranted to ensure that the combined punishment is not increased unduly by the fortuity and timing of separate prosecutions and sentencings. Nevertheless, it is intended that a departure pursuant to this application note result in a sentence that ensures a reasonable incremental punishment for the instant offense of conviction.
>
> To avoid confusion with the Bureau of Prisons' exclusive authority provided under 18 U.S.C. § 3585(b) to grant credit for time served under certain circumstances, the Commission recommends that any downward departure under this application note be clearly stated on the Judgment in a Criminal Case Order as a downward departure pursuant to §5G1.3(c), rather than as a credit for time served.

This Court should not rely on the Bureau of Prisons to make the appropriate adjustment. Under 18 USC §3585(b)(2), "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences..." not only for charges related to the federal offense of convictions, but also "(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence". Arguably, then, he would qualify for credit for prior custody under the literal terms of 18 U.S.C. § 3585(b)(2).

> However, it is well-established that a request for credit for prior custody under 18 U.S.C. § 3585(b)(2) must be made, in the first instance, to the Attorney General through the Bureau of Prisons upon imprisonment after sentencing. See United States v. Wilson, 503 U.S. 329, 334 (1992) ("[Section] 3585(b) does not authorize a district court to compute the [presentence detention] credit at sentencing."). Once administrative remedies are exhausted, see 28 C.F.R. §§ 542.10-542.16, prisoners may then seek judicial review of any jail-time credit determination, see Wilson, 503 U.S. at 335, by filing a habeas petition under 28 U.S.C. § 2241.

*Rogers v. United States*, 180 F.3d 349 (1st Cir. 1999).

See, *U.S. v. White*, 354 F.3d 841 (9th Cir. 2004) (where defendant spent 10 months in state custody until his trial for attempted murder and was acquitted, then prosecuted in federal court for felon in possession, sentencing remanded to determine whether to depart where District Court erroneously believed only BOP could give defendant credit for the ten months already served because departure authorized under then 5G1.3 App. note 7).

## CONCLUSION

For the reasons set forth above, defendant's motions for departures and mitigation should be granted.

Dated this 28th day of April, 2006 at Boston, Massachusetts.

_____
Kevin Lawrence Barron 550712
Attorney for Michael O'Donnell
453 Washington Street 5B
Boston, MA 02111-1325
Tel. No. 617-482-6368
Fax: 617-517-7711
Email: k@lawyerbarron.com

## CERTIFICATE OF SERVICE

Counsel certifies that he has served AUSA Donald Cabell electronically with a true ".pdf" copy of these exhibits today on April 28, 2006 by electronic mail and that he has served USPO Jeffrey Smith with a true copy of the same by leaving it at his office.

_____
Kevin Lawrence Barron 550712



SEARCH

# Essex County
# SHERIFF'S DEPARTMENT

Our Facilities

## LAWRENCE CORRECTIONAL ALTERNATIVE CENTER (CAC)



The Essex County Sheriff's De
operational control of the Law
Alternative Center in April, 19
on 13 acres bordered by the I
interstate 495. Seven of the
grow fresh produce that is ha
male and female offenders in
Middleton, Lawrence and Sali

The Marston Street complex v
by the city of Lawrence in 18(
for recalcitrant boys. Today,
used as a pre-release facility
with drug and alcohol addictic
members of society.

**REHABILITATION AND EDUCATIONAL SERVICES**
The CAC has the capacity to house 290 offenders. Violent criminals and sex offenders are ine
placement. Offenders are assigned through a classification process conducted at the Middleto
Correction.

Programs offered include:

- SUBSTANCE ABUSE TREATMENT COMMUNITY FOR OFFENDERS (SATCO)
- ANGER MANAGEMENT
- ALTERNATIVES TO DOMESTIC VIOLENCE AND ABUSE (ATV)
- ADULT BASIC EDUCATION

**WORK RELEASE**
Offenders who have completed their mandatory rehabilitative programs and are on the verge
eligible for this program. Working with staff, offenders are placed in jobs throughout the regic
first shift, others the second. Depending upon the program, the employer will pick up the offe
and return him when the shift has concluded. Other offenders are brought to and from their j

Department employees conduct frequent security checks on these offenders. Wages earned a
department for the offenders and given to them upon their release. The money is also used t(
board, legal fees, fines, child support and victim restitution.

**COMMUNITY SERVICE**
More than 100 offenders participate in this program. Work crews, under the supervision of sta
municipal projects in the 34 cities and towns that comprise the county. Some of the work con
on the region's roadways. Other projects completed include: cleaning Lawrence's Bellevue Ce
snow away from Lawrence's fire hydrants; painting Salisbury Town Hall; setting flags atop the
Newburyport's veterans; clearing a vacant lot on Saunders Street in Salem; painting Haverhill
constructing Newburyport's skate park.

